Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8109 | **DATE** | 1/16/2002 |
| **CASE TITLE** | Joseph Brazzale vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order. Plaintiff's motion for summary judgment [12-1] is granted. Defendant's motion for summary judgment [13-1] is denied. The cause is hereby remanded to the Commissioner of Social Security for further proceedings consistent with the opinion. Judgment is entered pursuant to Rule 58 F.R.C.P.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JAN 22 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | cm | 19 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 JAN 18 PM 1:21 | 1/16/2002 | |
| SM | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice SM mailing deputy initials | |

DOCKETED
JAN 2 2 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH BRAZZALE, <br><br> Plaintiff, <br><br> v. <br><br> JO ANNE B. BARNHART, <br> Commissioner of the Social Security <br> Administration, <br><br> Defendant. | Case No. 00 C 8109 <br><br> Magistrate Judge Ian H. Levin |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Brazzale ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). Before the Court are the parties cross-motions for summary judgment. For the reasons set forth below, the Court remands the cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On July 6, 1999, Plaintiff applied for DIB alleging that he became disabled on October 26, 1997, due to fractured legs he sustained when he was struck by an automobile, and a subarachnoid hemorrhage.[1] (R. 114, 126.) Plaintiff's initial application for benefits was denied, and subsequently, upon review, Plaintiff's reconsideration request was also denied. (R. 92, 97). On February 28, 2000,

---

[1] References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

an administrative hearing was held before an Administrative Law Judge ("ALJ"). At the hearing, Plaintiff testified and was represented by counsel. (R. 21-79.) On April 5, 2000, the ALJ issued his decision finding that Plaintiff was not disabled because he could perform a significant number of jobs in the national economy. (R. 11-17.) The Appeals Council, subsequently, denied Plaintiff's request for review, and the ALJ's decision became the agency's final decision. (R. 4-5.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I. PLAINTIFF'S BACKGROUND

Plaintiff was born on February 8, 1978. (R. 114.) Plaintiff graduated from high school, and worked as a grocery store stock clerk, sporting goods salesman, and plumbing laborer. (R. 127, 131.) Plaintiff stopped working in October, 1997, when he was struck by an automobile. (R. 19.)

### II. MEDICAL EVIDENCE

On October 27, 1997, Plaintiff was hit by an automobile. (R. 168.) Plaintiff sustained bilateral tibia and fibula fractures, along with a right ankle fracture. (R. 168-69.) Dr. James R. Davis (orthopedic surgeon) surgically repaired the leg fractures using a rod and screws in each tibia, and a single screw in the right ankle. (R. 180, 324-27.) Plaintiff was discharged from the hospital one week later, and subsequently, received physical therapy. (R. 168, 220.)

In March 1998, the screw was removed from Plaintiff's right leg. (R. 328-29.) In April 1998, Plaintiff walked without pain and had no significant complaints. (R. 205.) Dr. Davis, however, noted that there was an area of malunion over the right tibia. (R. 205.)

On May 7, 1998, Plaintiff received treatment from Dr. Richard A. Berger (orthopedic

2

surgeon). (R. 238.) Dr. Berger reported that Plaintiff had slightly weak plantar flexion and a valgus alignment of his right tibia (i.e., his right leg was turned outward), but he had normal motor function and no neurological abnormalities. (R. 238.) The following week, Dr. Davis suggested that Plaintiff undergo surgery to straighten the tibia. (R. 203.) On July 8, 1998, Dr. Davis surgically removed the right ankle screw and the old right tibia rod and screws, and put in a new rod and screws. (R. 191, 193, 216-219, 330-33.)

On July 24, 1998, Plaintiff walked without assistance and had no complaints. (R. 199.) Dr. Davis recommended physical therapy to strengthen the posterior tibialis tendon. (R. 199.) On August 4, 1998, Plaintiff's x-rays showed that the right tibia was "beginning to heal up quite nicely." (R. 196.) By the end of August, Plaintiff stated that his right leg was only "slightly painful" and he was able to walk "quite nicely." (R. 195.) Plaintiff's x-rays showed increased healing where the new rod was placed, but Plaintiff's right ankle was still weaker than his left ankle. (R. 195.)

On September 25, 1998, Plaintiff told Dr. Davis that "occasionally he ha[d] pain following strenuous work." (R. 191, 193.) Plaintiff also stated that he was "back to about 70% of his previous function" and could walk and ride his bike without difficulty. (R. 191, 193.) Plaintiff reported that he only occasionally needed to take Tylenol. (R. 191, 193.) Dr. Davis reported that Plaintiff's right quadriceps was weaker than before, but that his right hamstring was stronger, and his right ankle had improved significantly. (R. 191.) Plaintiff, however, still had difficulty lifting his own weight with his right foot. (R. 192, 194.) The x-rays, however, showed "good callous formation." Dr. Davis reported that Plaintiff's condition was stable, and recommended that he continue physical therapy and get a work capacity evaluation. (R. 192, 194.)

On October 6, 1998, Plaintiff underwent a work capacity evaluation at Ingalls Center for

Outpatient Rehabilitation. (R. 220.) Ms. Carolyn Day, Case Manager, Work Services evaluated Plaintiff and found that he had a moderately limited range of right ankle motion; however, he had normal ankle strength. (R. 222.) Plaintiff could (1) lift seventy-five pounds from the floor to over his head; (2) lift fifty-eight pounds from the floor to knuckle level; (3) carry sixty-one pounds at shoulder level; (4) frequently lift twenty-three pounds from the floor to his waist; and (5) frequently lift thirty-three pounds from his waist to shoulder level. (R. 220.) According to Ms. Day, Plaintiff was able to function at the medium-to-medium-heavy level of exertion. (R. 220.) Ms. Day concluded that Plaintiff could not return to his former plumbing job, and recommended a three-week work conditioning program, followed by a two or three-week work hardening program. (R. 222.)

On October 23, 1998, Plaintiff told Dr. Davis that he was going to return to school so that he could pursue a new career. (R. 189.) Dr. Davis reported that Plaintiff had a full range of right knee motion and that the right tibia x-rays looked "quite nice[]." (R. 189.) Plaintiff, however, still had a limited range of ankle motion, and Dr. Davis suggested that Plaintiff continue his exercises. (R. 189.) Plaintiff stated that he did not wish to do so. (R. 189.) Plaintiff requested a disability evaluation, but Dr. Davis indicated that he did not perform this type of evaluation. (R. 189.) Dr. Davis, however, told Plaintiff that his partner, Dr. Schleuter, performed disability evaluations, and that he would give Plaintiff a referral for the evaluation. (R. 189.)

On November 18, 1998, Mr. Doug Bradley, a physical therapist with Work Conditioning Systems evaluated Plaintiff's functional work capacity. (R. 229.) Plaintiff told Mr. Bradley that he had pain when he squatted, knelt down and walked for more than one mile. (R. 230.) Mr. Bradley assessed Plaintiff's condition and found that Plaintiff's (1) right hip extension strength had decreased by fifty percent; (2) right-sided carrying ability had decreased by twenty-five percent; (3) right leg

4

stability had decreased by thirty-five percent; and (4) right gastric/soleus and dorsiflexion had decreased by forty percent. (R. 230.) Mr. Bradley concluded that Plaintiff had the capacity to perform at a medium level of physical exertion. (R. 230.) Moreover, Mr. Bradley suggested that Plaintiff obtain an orthotic appliance for his shoe to help stabilize his right leg and relieve his pain. (R. 230.)

On December 10, 1998, Dr. Raymond Schleuter (after examining Plaintiff on two occasions) stated that, according to the American Medical Association of Disability and Impairment Rating Guide, Plaintiff had "zero" permanent disability. (R. 227.) Dr. Schleuter, however, noted that, according to the functional capacity evaluation conducted by Mr. Bradley at Work Conditioning Systems, Plaintiff had a two percent total body impairment, and a five percent lower extremity impairment. (R. 227-28.) Dr. Schleuter stated that Plaintiff had reached maximum medical improvement, and "would not be expected to be above the medium physical demand level, according to the U.S. Department of Labor." (R. 227-28.) Moreover, Dr. Schleuter suggested that work hardening would be appropriate. (R. 190.)

On December 23, 1998, Dr. Berger reported that Plaintiff had pain at the site of his leg and ankle screws, had a limited range of ankle motion, and had only eight percent of his muscle strength. (R. 236.) Plaintiff's knees and hips, however, were normal. (R. 236.) Dr. Berger released Plaintiff to return to work, but indicated that Plaintiff should not lift more than twenty pounds, stand for more than four hours a day or engage in heavy labor. (R. 234, 237.) Dr. Berger also prescribed orthotic arch supports and heel wedges for Plaintiff's shoes. (R. 235.)

On May 28, 1999, Plaintiff was admitted to the hospital due to a headache which was accompanied by nausea and vomiting. (R. 240, 334.) Plaintiff underwent a cerebral angiogram which was normal and showed no aneurysm or vasospasm. (R. 240, 244-45, 334.) A CT scan of

5

Plaintiff's brain was also normal and failed to show any evidence of acute intracranial hemorrhage, hematoma or hydrocephalus. (R. 240, 242, 334.) Plaintiff underwent a transcranial Doppler ultrasound exam which showed no evidence of vasospasm or arterial occlusive disease. (R. 248.) Plaintiff's physicians diagnosed him with a subarachnoid hemorrhage (sudden bleeding in the subarachnoid space in the brain). Plaintiff was given medication for the headache, along with some anti-nausea medication (R. 240, 334.) On June 7, 1999, Plaintiff's was discharged from the hospital with instructions from his attending physician Dr. Leonard Cerullo (neurosurgeon) to see Dr. Dan S. Heffez (neurosurgeon), in one month, drink at least two liters of fluid a day, and avoid lifting more than five pounds. (R. 241, 335.)

On July 7, 1999, Plaintiff saw Dr. Heffez for a follow-up evaluation of his subarachnoid hemorrhage and "repeat MRI scanning of the brain." (R. 299.) Dr. Heffez reported that the subarachnoid hemorrhage "proved to be of undetermined etiology." (R. 299.) Plaintiff told Dr. Heffez that he did not have any headaches, balance problems or neurological symptoms. (R. 299.) Dr. Heffez instructed Plaintiff to see him on an as-needed basis. (R. 299.)

In September, 1999, Dr. Boyd E. McCracken, a state reviewing physician, performed a "Physical Residual Functional Capacity Assessment." Dr. McCracken reviewed the record and opined that Plaintiff could occasionally lift up to twenty pounds; frequently lift up to ten pounds; and stand, sit and walk for six hours (per activity) each day. (R. 289.) In addition, Plaintiff could only occasionally crouch and climb stairs, but he could never climb ladders, ropes or scaffolds. (R. 290.)

On November 5, 1999, Plaintiff saw Dr. Heffez for the first time since July, 1999. (R. 298, 336.) Plaintiff complained of headaches and neck pain. (R. 298, 336.) Dr. Heffez stated that Plaintiff's MRI of his brain showed no evidence of brain stem compression. (R. 298, 336.) Dr.

6

Heffez recommended that Plaintiff undergo an MRI of the cervical spine to rule out spinal stenosis as a source of his headaches. (R. 298, 336.) Two weeks later, Dr. Heffez reported that a cervical MRI showed spondylosis and stenosis, but indicated no evidence of disc herniation. (R. 297, 337.) Dr. Heffez instructed Plaintiff on proper body mechanics and prescribed a soft cervical collar to be worn while Plaintiff slept, rode in a car and worked at a desk. (R. 297, 337.)

### III. PLAINTIFF'S TESTIMONY/EVIDENCE

At the February 28, 2000 hearing, Plaintiff testified that he had stiffness in his legs that was worse in the morning, but eased as the day progressed; had leg pain that increased as he was more active; and had daily headaches that were worse at night. (R. 40, 45, 63-64.) Plaintiff stated that he took Tylenol for his leg pain and headaches, and was able to concentrate despite his headaches. (R. 41, 45, 73.) Plaintiff testified that his leg bones had completely healed and that he could walk, but he could not kneel or crouch. (R. 42.) Moreover, Plaintiff stated that he was not supposed to lift anything heavy or stand for more than four hours. (R. 42.)

Plaintiff testified that he visited friends, helped his sister around the house and swam twenty-five to thirty laps at the "Y" twice a week. (R. 52, 66.) Plaintiff estimated that he could stand for up to two hours without interruption, sit for one hour at a time, and walk up to three blocks. (R. 56.) Plaintiff also testified that he did not have any problems lifting a gallon of milk. (R. 57.) Plaintiff further stated that he had recently obtained his emergency medical technician license. (R. 26-28, 47-49.)

In an Activities of Daily Living Questionnaire and a Pain Questionnaire completed on July 20, 1999, approximately seven months before the administrative hearing, Plaintiff stated that he had pain in his lower legs, hip, lower back and head that was aggravated by walking and moving. (R.

144.) Plaintiff reported that he took Tylenol, wore a shoe insert, and did some swimming and stretching to relieve the pain. (R. 144-45.) Plaintiff further reported that, despite his pain, he went grocery shopping once a week, cleaned, and did laundry three or four times a week. (R. 140.) Plaintiff indicated that he left his house two or three times a day to visit family and friends, run errands, and keep appointments. (R. 141.) Plaintiff also reported that he did not have any problems with memory or concentration. (R. 140-41.)

In addition, in August 1999, in a Reconsideration Disability Report, Plaintiff reported that he could not stand more than four hours, walk long distances, or lift more than fifteen pounds. (R. 147.)

## IV. VOCATIONAL EXPERT'S TESTIMONY

Mr. Thomas Dunleavy, a Vocational Expert, testified at the administrative hearing. (R. 80.) Mr. Dunleavy classified Plaintiff's past jobs as requiring medium to heavy levels of exertion. (R. 80.) Mr. Dunleavy was asked to assume a hypothetical person of Plaintiff's age, educational level, and past work experience. (R. 80-81.) Mr. Dunleavy opined that this hypothetical person could perform sedentary work that required only a low degree of concentration, and involved simple, one and two-step instructions. (R. 83-84.) Mr. Dunleavy, therefore, concluded that Plaintiff could perform small parts assembler jobs (approximately 4,500) and hand packager jobs (approximately 3,000). (R. 84-85.)

## V. THE ALJ'S FINDINGS AND DECISION HEREIN.

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 26, 1997. (R. 16.) The medical evidence establishes that Plaintiff has severe status-post bilateral leg fractures and a subarachnoid hemorrhage. (R. 16.) The ALJ determined, however, that

Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App 1. (R. 16.)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's RFC to determine what he could do despite his limitations. The ALJ found that Plaintiff has the RFC to perform the physical exertional and nonexertional requirements of work, except for prolonged standing and walking. (R. 16.) The ALJ also determined that Plaintiff requires a job that entails a low degree of concentration (due to pain) and involves simple one and two step tasks. (R. 16.) The ALJ concluded that Plaintiff has the RFC to perform light work; however, his work would be subject to specified limitations. (R. 16.) Therefore, the ALJ determined that Plaintiff was unable to perform his past relevant work as a plumber's helper, sales associate, and stock clerk (bagger). (R. 16.)

The ALJ determined that although Plaintiff's additional nonexertional limitations do not allow him to perform the full range of sedentary work, there are still a significant number of jobs in the national economy which he can perform. (R. 17.) Such jobs include: small parts assembler jobs (approximately 4,500) and hand packager jobs (approximately 3,000). (R. 17.) The ALJ, therefore, concluded that these represent job opportunities in the regional area that Plaintiff can perform which are consistent with his impairment and resulting functional limitations. (R. 17.)

The ALJ further found that while Plaintiff's subjective complaints were generally credible, they were inconsistent with his daily living activities, and consequently, his impairments were not disabling. (R. 16.)

Accordingly, the ALJ found that Plaintiff was not disabled under the terms of the Act. (R. 17.)

## LEGAL STANDARDS

### I. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Social Security Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### II. STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, an SSI or DIB claimant must be "disabled" as defined by the Social Security Act. *See* 42 U.S.C.§ 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

10

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, app.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## **ANALYSIS**

Plaintiff argues that the ALJ's April 5, 2000 decision that Plaintiff is not disabled is not supported by "substantial evidence" and requests that the Court remand the cause. Plaintiff principally alleges that the ALJ erred by failing to propound a proper hypothetical question, (specifically, hypothetical question number 4) in that, the ALJ's hypothetical question did not set forth Plaintiff's impairments and corresponding allegations of pain as supported by the evidentiary record. *See generally*, Pl.'s Briefs. The Commissioner, on the other hand, argues that the hypothetical question propounded by the ALJ incorporated all of Plaintiff's severe impairments, including pain, because the limitations set forth in the hypothetical (i.e., that Plaintiff could not stand for more than four hours per day and could not lift more than 15 pounds at a time) implicitly included Plaintiff's allegations of pain. Def.'s Mem. at 13.

The Court finds that the record is incomplete on a critical point(s). As is pertinent here, the Vocational Expert's conclusion that Plaintiff could perform certain jobs he specified in the national economy (R. 81-84), which the ALJ relied on and adopted in his decision *en toto* (R. 17), was based on the hypothetical premise that Plaintiff could not stand more than four hours in an eight hour day (R. 82-84). This hypothetical premise was based on the assessment of the Plaintiff's treating physician, Dr. Berger, that Plaintiff "may stand for no more than four hours per day." (R. 14, 237.) However, in this same assessment, Dr. Berger earlier stated *inter alia* that Plaintiff's "pain is with activity, and if he stands for more than 15 minutes, he gets pain in his ankle, on the medial and lateral side." (R. 236.) These two statements raise certain inconsistencies in Dr. Berger's assessment that were never explained by him nor developed in the proceedings below. For example, does this mean that Plaintiff really can't stand for four hours because he, then, has ankle pain every fifteen minutes; or rather, that Plaintiff merely can't stand more than four hours in a day due to the described

ankle pain. Further, was the doctor referring to four hours in a workday (of eight hours) or a full about 16 hour day.[2] Also, because of the intermittent pain every 15 minutes, would the Plaintiff need breaks in the four hours of standing, and, if so, how many breaks each four hours.

Accordingly, the Vocational Expert's conclusions that Plaintiff was capable of performing specified jobs in the national economy, which the ALJ relied on *en toto* in finding Plaintiff not disabled, was based on an unreliable hypothetical premise. The cause, must, therefore, be remanded for Dr. Berger to clarify his medical findings and for the propounding of new hypothetical questions to the Vocational Expert based on Dr. Berger's clarified report. *See, e.g., West v. Apfel*, 2000 WL 1847766, *6 (N.D. Ill. Dec. 14, 2000) (district court remanded case to recontact the treating psychologist in order to clarify inconsistencies in her report with respect to plaintiff's Global Assessment of Functioning.); 20 C.F.R. § 404.1512(e)(1).[3]

In addition, the parties assert differing positions regarding the rest periods that Plaintiff needs

---

[2]If the latter, the ALJ's subject hypothetical, which was based on an eight hour day, would have been unreliable on this point also.

[3]20 C.F.R. § 404.1512(e)(1) provides, in pertinent part:

> We will first recontract your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e)(1).

Moreover, if the relevant information cannot be obtained from Dr. Berger, the ALJ shall follow the mandate established in 20 C.F.R. § 404.1512(f) in determining Plaintiff's ability to stand for specified periods of time. As specified in 20 C.F.R. § 404.1512(f) if " . . . we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense." 20 C.F.R. § 404.1512(f).

in order to accommodate his impairments. Plaintiff asserts that he testified that he needs rest periods or breaks "almost 10-20 minutes per hour during his 13 hour college class week." Pl.'s Mem. at 11. Defendant, on the other hand, states that Plaintiff did not testify that he needed such breaks and that there is no evidence in the record to support Plaintiff's assertion. Def.'s Mem. at 12.

Upon review, the Court finds Plaintiff's testimony regarding the rest periods he needs to accommodate his impairments not totally clear and not fully developed. (R. 56, 73.) Therefore, the Court finds that additional testimony is needed from Plaintiff to clarify the rest periods he needs to accommodate his impairments and that this clarified evidence need, then, be incorporated into the hypothetical questions to the Vocational Expert as to whether there are relevant jobs in the national economy that Plaintiff is capable of performing.[4]

## **CONCLUSION**[5]

In view of the foregoing, the Court grants Plaintiff's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment. Accordingly, the cause is remanded to the Commissioner for further proceedings consistent with this opinion.[6]

---

[4]At the hearing below, the Vocational Expert was not asked any hypothetical question addressing rest periods needed by Plaintiff to accommodate his impairments.

[5]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments. Both parties can present their positions on these arguments to the ALJ upon remand.

[6]Plaintiff's request for reassignment to a different ALJ, is denied as, respectfully, being without legitimate basis.

14

ENTER:

*[signature: Ian H. Levin]*

**IAN H. LEVIN**
**United States Magistrate Judge**

Dated: January 16, 2002